† PENOBSCOT & KENNEBEC RAILROAD CO. *versus* DUNN.

The plea of the general issue, to an action by a corporation, admits its legal organization under its charter, so far as to maintain suits at law.

An agreement to take and fill a given number of shares, in an incorporated company, is equivalent to a promise to take and pay for such shares.

Of conditional subscriptions to stock in such companies.

When a subscription is made on condition, that a certain number of shares shall be subscribed for before the corporation shall be organized, the *records*

Penobscot & Kennebec Railroad Co. *v.* Dunn.

of its proceedings showing that the required number had been taken, are competent and *prima facie* evidence, that the condition has been performed.

And where a subscription is based on a further condition, that the company is not to enter into any contracts for the construction of its road, until a given number of shares are taken, the books of the *directors*, in the absence of countervailing evidence, are competent evidence to show the fulfillment of the condition, if the directors had authority to act.

And the doings of a board of directors, *de facto*, whose acts have been ratified by the corporation, are unobjectionable, although the records of the corporation show another board to have been previously elected, but no evidence of their accepting the trust.

Where one of the conditions of the subscription to the capital stock of the corporation was, that not more than five dollars on a share should be assessed at *one time*, and the directors laid two or more assessments at the same time, but required not more than five dollars at one payment, such assessments are binding.

Whether directors of a corporation have power to release a subscription to the capital stock of the company, without consideration, *quere?* But if they possessed such power, and the release is optional with the subscriber, he must elect within a *reasonable time.*

A recognition and claim of representing such shares, long after such action of the directors, may well be considered an election to keep the shares subscribed for.

ON REPORT from *Nisi Prius*, HATHAWAY, J., presiding.

ASSUMPSIT. This action was brought to recover the amount of certain shares in the capital stock of the corporation subscribed for by defendant, and for assessments made thereon.

The plea was the general issue.

After the evidence on the part of plaintiffs was submitted, it was agreed to report the cause for the consideration of the full Court; and if upon the evidence the action is maintainable, a default to be entered and damages assessed by the law Court; otherwise to stand for trial.

In the charter introduced were these provisions; "The capital stock of said corporation shall consist of not less than four thousand, nor more than ten thousand shares; and the immediate government and direction of the affairs of said corporation shall be vested in seven, nine, or thirteen directors, who shall be chosen by the members of said corporation in the manner herein provided, and shall hold their

offices until others shall have been duly elected and quali-
fied to take their places."

"Any seven of the persons named in the first section,
were authorized to call the first meeting by giving notice in
one or more newspapers published in Portland, Augusta,
Bangor, and Boston."

The charter authorized the president and directors "to
make such equal assessments from time to time on all the
shares in said corporation, as they may deem expedient and
necessary in the execution and progress of the work, and
direct the same to be paid to the treasurer of the corpora-
tion. And the treasurer shall give notice of all such as-
sessments; and in case any subscriber or stockholder shall
neglect to pay any assessment on his share or shares for the
space of thirty days after such notice is given as shall be
prescribed by the by-laws of said corporation, the directors
may order the treasurer to sell such share or shares at pub-
lic auction, after giving such notice as may be prescribed as
aforesaid, to the highest bidder, * * * and such delinquent
subscriber or stockholder shall be held accountable to the
corporation for the balance, if his share or shares shall sell
for less than the assessments due thereon, with the interest
and cost of sale."

The location of the road was required to be made and
filed with the County Commissioners by Dec. 31, 1850.

The defendant subscribed a paper containing these terms:
"The subscribers hereby agree to take and fill the number
of shares set against their names respectively, in the capi-
tal stock of the Penobscot & Kennebec Railroad Co., on
the terms and conditions following, viz: —

"1st. Whenever any assessments upon said shares shall
be called for by the directors of said corporation, every
shareholder shall have the right to pay into the treasury
the amount of one hundred dollars on each share, including
previous payments, and shall be thereafter entitled to in-
terest at the rate of six per cent. per annum, payable semi-
annually, from the treasury on the stock so paid in full,

until the last assessment shall be called for and payable by the directors of the company. Assessments shall not exceed five dollars on each share at one time, or more than one hundred dollars in all.

"4th. The corporation may be organized when four thousand shares shall have been subscribed, but no contract for the building and completing the road shall be entered into until seven thousand shares shall have been subscribed."

Other provisions were embraced in the subscription paper, about which no questions arose.

To this paper the defendant subscribed "thirty shares," November 15, 1850. To another paper, of similar import, the defendant afterwards subscribed "ten thousand dollars, $10,000," Aug. 24, 1852.

The records of the stockholders were introduced, showing the organization of the company, the report of the committee upon the subscription to the capital stock, which set forth, that four thousand and sixty-seven shares were taken, and the adoption of certain by-laws.

In July, 1851, a board of directors was elected consisting of Messrs. Wood, Smith, Moor, Poor, Strickland, Pickering and Appleton.

In July, 1852, the records of the stockholders showed the election of Messrs. Stanley, Crocker, Cummings, Churchill, Wood, Kimball and Pickard, as directors. The records indicated no action on the part of this board.

Among the by-laws adopted by the corporation, was the requirement, that each member of the board of directors must be, at the time of his election, a shareholder in the capital stock of the company; and they should hold their office until others were chosen in their stead, and accepted the office. They were also authorized to dispose of the residue of the capital stock authorized by the charter, and not subscribed for at the time of the organization, in such manner, at such times, and from time to time, as they shall judge most for the interest of the company.

By those laws the treasurer was required to issue certi-

ficates of stock to all persons entitled thereto, and keep suitable books showing the number of shares held by the respective stockholders from time to time.

At a meeting of the directors on July 27, 1852, as appeared by the records, the directors passed the following vote : —

"Whereas information has been given us that the amount of $600,000 cannot be obtained in subscriptions to the stock of this company, being the sum required to make the subscriptions in Bangor binding; therefore, voted, that the subscriptions to the capital stock of the Penobscot and Kennebec Railroad Co. made up to the present time in the city of Bangor, Waterville and towns in the vicinity, be and are hereby declared not binding on said subscribers only so far as they shall elect to pay said subscriptions."

The directors transacted some of their business with only a majority of the board present, without notice having been given to the others. All the doings at such meetings were subsequently ratified by the entire board.

The records of the directors showed that twenty several assessments had been laid upon the shares subscribed for by defendant, and in some instances more than one assessment was made at the same time, but payable at different times. The amount of all the assessments was $100 to each share.

The subscription books were also introduced, and the newspaper notices of assessments.

Defendant's proxy to one Barrett was put into the case to act for him at the meeting of the corporation in July, 1853, and evidence that at said meeting Barrett voted for defendant, representing 130 shares.

Plaintiffs introduced some of the stockholders as witnesses, subject to objections.

*Kent*, for defendant, maintained, that as to the first thirty shares no action can be maintained, except for such balance as remained after a sale of the shares; and to sustain any action for assessments, a legally constituted company must be proved. He also argued the definite admissions by plead-

ing the general issue. *Boom* v. *Lamson*, 16 Maine, 224; *Day* v. *Stetson*, 8 Maine, 365.

The objections to the legality of the organization were:

1st. That the original call, and not a copy of the record should have been produced.

2. That the notice was not proved either *aliunde* or by record.

3. That the records are not evidence of the required number of shares being subscribed; they purport to give the report of a committee. As to the proper matters to be proved by records, he cited *Fuller* v. *Sholwell*, 7 S. & R. 14; Greenl. Ev. vol. 1, § § 491, 493; *Louden* v. *Lynn*, 1 H. Black. 214, (note;) 3 S. & R. 29; 10 Johns. 154.

And the same objection lies to the want of any legal evidence, that the conditions were complied with so as to maintain an action on the subsequent subscription.

He also objected to the authority of the directors, according to the records of Pickering and others, making assessments, when it appeared by the stockholders' records, that other directors had been previously chosen, and that the proceedings, in electing directors, were illegal.

He also maintained that defendant was released from the subscription of thirty shares by the action of the directors; if their doings were good for any thing they were good for that. It was certain the defendant did not elect to pay for the shares. *Union Turnpike Co.* v. *Jenkins*, 1 Cain's; Angel & Ames on Cor., § § 231 and 280; *Marlborough Manufacturing Co.* v. *Smith*, 2 Cow; 11 Mass. 288.

The assessments were not legally made. The charter authorized them to be made from time to time; but many of them are here laid at the same time, though payable at different times.

It did not appear that the directors of 1853, by whom sixteen of the assessments were made, were stockholders as required by charter. The plaintiffs must show they were such *de jure;* in tax cases the assessors must be such *legally.*

He also objected to the members of the corporation as

witnesses, being parties to the suit. *Oldtown Bank* v. *Houlton*, 21 Maine, 501.

He also argued as to the effect of the proxy to Barrett, that it only related to the 30 shares, and even if defendant admitted thereby that he was a stockholder, it did not hinder him from contesting the legality of the proceedings.

*Rowe & Bartlett*, for plaintiffs.

The organization of the company is admitted by the general issue. 16 Maine, 224; 17 Maine, 34; 12 Maine, 224.

It is shown also by the records kept according to the by-laws, which are the best evidence. *Owings* v. *Speed*, 5 Wheat. 420; *Highland Turnpike Co.* v. *McKeen*, 10 Johns. 154; *Coffin* v. *Collins*, 17 Maine, 440; 3 Met. 133 and 282; 7 Met. 592.

And those records are *prima facie* evidence that all the steps required previous to the organization, had been taken. *Wood* v. *Jefferson Co. Bank*, 9 Cowen, 194.

It requires only an organization *de facto*, to maintain this suit. 1 Met. 359.

The assessments were made by directors *de facto*, which is enough. *Charitable Association* v. *Baldwin*, 1 Met. 359; Angell & Ames on Corp., pp. 272, 273.

The directors were such also *de jure*. They were chosen in 1851, and accepted the trust. No evidence is in the case that those elected in 1852 ever accepted the trust or claimed the right to act; and the evidence is full that the board of 1851 continued to act till 1853.

The directors had no power to release defendant from his subscription; it was made unconditionally. The vote should be limited to the subscriptions made after the organization in Bangor, on condition of raising $600,000. The vote as to any other subscriptions, was *nudum pactum*. But if it were otherwise, the defendant has ratified his subscription by his acts through Barrett, long after the vote was passed.

In making assessments, the real meaning of the contract has been observed; the condition obviously was, that not more than $5 should be required at one time.

Stockholders were competent witnesses by c. 181, Acts of 1855; but if not, their testimony in this case is immaterial.

RICE, J. — It was decided in *Oldtown & Lincoln Railroad Co.* v. *Veazie,* ante, p. 571, that a plea of the general issue does in our practice admit the existence of the corporation, with a capacity to sue and be sued. It cannot be an admission of more than this. There is nothing in the plea authorizing it. The decided cases do not; the plea contains no language that the corporation has performed its duties in other respects, or that it has performed its part of a condition by which a conditional contract with it has become binding.

By the pleadings therefore, it is admitted that the plaintiff is competent to be a party in Court, and is properly in Court; and being a corporation acting only by force of its charter, this admission necessarily implies a legal organization under that charter.

The action is assumpsit, and based upon two subscriptions to the capital stock of the corporation. These subscriptions so far as their terms become material, are as follows: —

" The subscribers hereby agree to take and fill the number of shares set against their names, respectively, in the capital stock of the Penobscot and Kennebec Railroad Company, on the terms and conditions following, viz: —

"4th. The corporation may be organized when four thousand shares shall have been subscribed, but no contract for building or completing the road shall be entered into until seven thousand shares shall have been subscribed."

An agreement to take and fill a given number of shares in an incorporated company, is equivalent to an agreement to take and pay for such shares. Upon such agreement, assumpsit will lie for the stipulated price of the shares. *Bangor Bridge Co.* v. *McMahon,* 10 Maine, 478.

A subscription to the capital stock of an incorporated company, is a contract between the subscriber and the company. The subscriber may simply agree to take a given amount of stock, and in that event the remedy of the corpo-

ration, in case of neglect to pay assessments, is upon the stock; or he may agree to take and pay for the stock absolutely, or upon such conditions as he may choose to incorporate into his subscription. Such conditions are ordinarily incorporated into subscriptions for the protection of the subscriber, and to insure the completion of the enterprize.

Where a subscription is made upon condition that the company shall not be organized, or shall not enter upon the principal object of its organization until a given amount of its stock shall be subscribed, such condition is a condition precedent, and the company will not be authorized to enforce the collection of such subscription until they have complied with such conditions on its part.

A person might be willing to become a stockholder in a railroad corporation, which should have four hundred thousand dollars of its stock subscribed before its organization, and seven hundred thousand before entering into a contract for building and completing its road, who would be unwilling to subscribe to its stock without restriction. Such a condition would provide for a capital amply sufficient to secure a full preliminary exploration and survey of the route for a road, and ensure the prompt construction of the road.

The right of the corporation to assess the stock of the defendant, depended upon the conditions in his subscription. If the company have complied with those conditions, then its right to assess under its charter and by-laws, and in conformity therewith, immediately accrued, and such assessments if legally made, may be collected. If the conditions in the subscription had not been performed on the part of the company, then the assessments cannot be collected, and it matters not what may have been the form of the assessments.

To show that the number of shares had been subscribed requisite to authorize the organization of the company, the plaintiff introduced the records of the proceedings of the stockholders. By these records it appears that before the organization there had been subscribed of the capital, four thousand and sixty shares. It is objected by the defendant

that the stockholders' records are not competent evidence by which to prove the amount of subscriptions.

These books not only contain the names of the persons who had subscribed to the capital stock of the company, and the amount subscribed by each person, but also show that more than four thousand shares were represented and voted upon at the organization.

In the case, *Highland Turnpike Co.* v. *Keene*, 10 Johns. 154, the Court say, "the general rule is, and it is a rule essential to public convenience, that corporation books are evidence of the proceedings of the corporation, but then it must appear that they are the corporation books, and that they have been kept as such, and the entries made by the proper officer, or some other person in his necessary absence.

The books of a corporation established for public purposes, are the best evidence of its acts, and ought to be admitted whenever these acts are to be proved. *Owings* v. *Speed*, 5 Wheat. 420; *Coffin* v. *Collins*, 17 Maine, 440.

Where a charter requires two thirds to form a quorum, and it was stated on the minutes that on due invitation the corporators met, that was held tantamount to saying that two thirds met. *Com.* v. *Woelper*, 3 S. & R. 29.

In *Wood* v. *Jefferson County Bank*, 9 Wend. 194, SAVAGE, C. J., remarked, that the Act of incorporation did not make any set of men a corporation *ipso facto*. There was something to be done. Books of subscription were to be opened; stock was to be subscribed for; that stock was to be distributed by commissioners; and those persons to whom the stock was thus distributed become stockholders. The stockholders were then to choose directors, and they a president and cashier.

"The books of the bank were produced, showing the election of the president and cashier. The production of the books showing the election of the officers was *prima facie* sufficient to show that the previous requisitions of the statute had been complied with, and that the corporation then had an existence."

We think these records were competent evidence, and that they are sufficient to show *prima facie*, that the number of shares necessary to authorize the company to organize according to the terms of the charter, and the condition in the defendants' subscription, had been subscribed before the organization.

The by-laws of the company, Art. 7th, provide that the directors shall have power to dispose of the residue of the capital stock authorized by the charter, and not subscribed for at the time of the organization, in such manner, at such times, and from time to time, as they shall judge most for the interest of the company.

The records of the directors show that on the 31st day of July, 1852, a committee of the directors was authorized to dispose of the residue, or any portion of the residue of the capital stock of the company remaining on hand, and not subscribed for at the time of the organization of the company, and not subscribed for under the direction of said committee since their appointment, on such terms and in such manner as they may judge most for the interest of the company.

This committee reported at a meeting of the directors, held on the 3d day of May, 1853, that they had procured subscriptions, as stated in their report, and had disposed of 4999 shares; and also submitted the books of subscription and a list of subscribers.

Whereupon it was voted by the board of directors that, " it now appearing that a subscription exceeding seven hundred thousand dollars having been obtained on the books of the corporation, that the contract for the construction of the road, made by the committee appointed for that purpose, with W. B. S. Moor, provisionally, with the amendments and alterations on sheet marked A, annexed to said contract, and concluded and signed by said Moor and James Dunning, be and hereby is ratified and confirmed."

As has been before remarked, it was essential, to make the subscription of the defendant obligatory on him, that the

company should obtain a subscription of four hundred thousand dollars before it organized, and of seven hundred thousand dollars before a contract was entered into for building and completing the road.

The procurement of a given amount of subscriptions was one of the preliminary measures necessary to enable the company to organize and prosecute the enterprise of constructing a road. No good reason is perceived why the books of the company may not be received as evidence to show that these requirements of the charter and by-laws have been complied with, as well as other pre-requisites, prescribed by the same authority. The acts of the directors, within the scope of their authority, are the acts of the company, and the books of the directors in which are recorded their authorized official acts as directors, are also the books of the company. We therefore are of opinion that the books of the directors, in the absence of countervailing evidence, are sufficient to show, that the subscriptions required to authorize the company to contract for the construction of the road have been obtained, provided the directors had authority to act in the premises. This authority is denied.

In July, 1851, as appears by the records of the stockholders, a board of directors were chosen consisting of Messrs. Pickering, Strickland, Moore, Wood, Smith, Poor and Appleton.

By the same records it also appears, that at a stockholders' meeting, held on the 27th of July, 1852, by adjournment, being an adjournment of the annual meeting, Messrs. Stanley, Crocker, Cummings, Churchill, Wood, Kimball and Pickard were chosen directors.

There is nothing appearing upon the records either of the stockholders or directors, showing that the board elected in 1852, ever accepted the trust, or acted as directors of the company, under that election.

By the third section of the charter it is provided, that "the immediate government and direction of the affairs of

said corporation shall be vested in seven, nine or thirteen directors, who shall be chosen by the members of said corporation, in the manner hereinafter provided, and shall hold their offices until others shall have been duly elected and qualified to take their places, a majority of whom shall form a quorum for the transaction of business."

The records show, that the board chosen in 1851 continued to act as directors after the annual meeting of 1852, in the same manner as they had done before that time. From that fact, and from the fact that the persons elected in 1852 do not appear to have acted in any instance as a board, the inference is almost irresistible, that the board elected in 1852 were never qualified to act, and consequently, that the board of 1851 were authorized to continue in office under the provision of the charter recited above. That they continued to manage the affairs of the company as directors until the annual meeting of 1853, and that their acts have been approved and ratified by the subsequent action of the corporation is manifest. This would constitute them directors *de facto*, if the functions of the office of directors were not exercised by them by strict legal right. *Charitable Association in Granville* v. *Baldwin,* 1 Met. 359.

There is, therefore, no valid objection to the acts or records of this board of directors on the ground of want of authority.

That assessments shall not exceed five dollars on each share at one time, is one of the conditions in the subscription of the defendant. It is objected, that in several instances the directors laid two or more assessments at the same time. It will be seen, however, that in no instance was payment required of more than five dollars upon a share at one time. The stipulation is evidently designed to protect the subscriber from being called upon to *pay* more than five dollars on a share at one time. That is the substance of the condition, and this we think was not violated by the mode of making the assessments.

As to the objection taken to the legality of the election of directors in 1853, on the ground that an adjournment was had during the process of balloting, it may.be remarked, that such a course may not be in conformity with ordinary practice, or the most approved rules of parliamentary proceedings, but we are not aware that it was in violation of any rule of law or any provision of the charter or by-laws of the corporation.

The assessments in this case having all been laid before the annual meeting in 1854, cannot be affected by any irregularity in the proceedings of that meeting, if any such existed. The records, however, disclose no such irregularity.

When a majority of a board of directors appear to have been present at the meetings of the board, at which business is transacted, the presumption is, that all the members of the board were duly notified to attend. *Sargent* v. *Webster*, 13 Met. 497.

At a meeting of the board of directors, held on the 27th day of July, 1852, the following preamble and vote was adopted : —

Whereas information has been given us, that the amount of $600,000 cannot be obtained in subscriptions to the stock of the company, being the sum required to make the subscriptions in Bangor binding :— Therefore *voted*, " that the subscriptions to the capital stock of the Penobscot & Kennebec Railroad Co., made up to the present time, in the city of Bangor, Waterville and towns in the vicinity, be and hereby are declared not binding on said subscribers, only so far as they shall elect to pay said subscriptions."

At that time the defendant was a resident of Waterville, and had subscribed, in 1850, for thirty shares of the stock of the corporation.

By this vote, it is contended that he is released from any obligation to pay for those thirty shares, unless he shall elect to pay for them, and that his resisting the claim of the company in this suit, is evidence of an election on his part not to pay.

Penobscot & Kennebec Railroad Co. v. Dunn.

Upon this state of facts, two questions arise. First, had the directors authority to release the defendant's subscription? Second, *when* should he make his election whether he would pay or not?

There is no such condition in the subscription of the defendant, as appears to have been incorporated into the subscription in Bangor.

By the 5th section of the charter, it is provided that " the president and directors for the time being, are hereby authorized and empowered, by themselves or their agents, to exercise all the powers herein granted to the corporation, for the purpose of locating, constructing and completing said railroad, and for the transportation of persons, goods and property of all descriptions, and all such powers and authority for the management of the affairs of the corporation, as may be necessary and proper. to carry into effect the object of this grant."

It may well be doubted whether these powers would authorize the directors to release a subscriber from his obligation to take stock without any consideration, and there does not appear to have been any consideration, so far as the defendant is concerned, for this conditional release by the directors.

But if the directors were authorized to make this conditional release, the defendant, to avail himself of it must make the election contemplated therein, within a reasonable time. He could not avail himself of the privileges of a stockholder, by reason of his subscription, for those shares, and at the same time repudiate his liability as a subscriber, on the ground that he had elected not to pay under that vote of the directors.

The case finds that at the annual meeting in 1853, a year after the vote referred to, the defendant by his proxy in writing, dated on the 5th of July, 1853, authorized Harrison Barrett to appear, act and vote for him, for the number of shares set against his name, being one hundred and thirty, and that said Barrett did vote on that number of

shares at said annual meeting in the choice of officers by virtue of said written authority. This act so long after the vote of the directors must be deemed an election to pay for the shares to which that vote referred.

It is provided by c. 181, of laws of 1855, § 1, that no person, offered as a witness, shall be excluded by reason of his interest in the event of the action, but his interest may be proved to affect his credibility.

"*Section* 2. — The above section shall not apply to a party to the action, nor to any person for whose immediate benefit it is prosecuted or defended."

The witnesses introduced were not parties to this action; it was not brought for their immediate benefit, but they undoubtedly have a contingent interest in the event of the suit, as it may affect favorably or otherwise the value of their stock in the corporation. Persons thus situated are, under this Act, *competent* witnesses.

Other objections which have not been specifically noticed, were made to the preliminary proceedings, affecting the organization of the corporation. But under the pleadings in this case, and in view of the presumption *omnia rite acta*, which "covers multitudes of defects in such cases," these objections cannot prevail.

The defendant, as a subscriber to the stock of the corporation, had a right to inspect the books, and to offer them or their contents in evidence. He has not seen fit to avail himself of this right, or in any other way to offer evidence to control that offered by the plaintiff. From the evidence in the case, we think the legitimate inference is, that there has been a compliance on the part of the corporation with the conditions precedent to be performed by them, and upon the performance of which the liability of the defendant to pay for his stock attached, and therefore, that, according to the agreement of the parties, a default must be entered, with judgment for $13000 damages.

*Defendant defaulted.*